1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9        SOUTHERN DISTRICT OF CALIFORNIA
10

11 | BACKCOUNTRY AGAINST DUMPS;      Case No.:  12cv3062 L (JLB)
   | et al.,
12 |                                 **ORDER RE: CROSS MOTIONS FOR**
   |                    Plaintiffs,   **SUMMARY JUDGMENT**
13 |
   | v.                              **ECF Nos. 74, 75, 77**
14 |
   | DR. STEVEN CHU, in his official
15 | capacity as Secretary of the United States
   | Department of Energy; et al.,
16 |
17 |                    Defendants.

18

19        **I.       BACKGROUND**

20       On August 17, 2012, the Department of Energy ("DOE") announced its decision to

21 issue a Presidential permit to Energia Sierra Juarez U.S. Transmission, LLC ("ESJ"), a

22 subsidiary of Sempra Energy. The permit, PP-334, allowed ESJ "to construct, operate,

23 maintain, and connect a double-circuit 230,000-volt (230-kV) electric transmission line

24 across the U.S.-Mexico border in eastern San Diego Country, California." 77 Fed. Reg.

25 49789-01.

26       The envisioned transmission line ("Project") would run approximately 1.65 miles

27 from the vicinity of La Rumorosa, Northern Baja California, Mexico to a spot near

28 Jacumba, California. Roughly .65 miles of the transmission line would be within the U.S.

The terminus in Mexico was ESJ's planned wind turbine facility, capable of generating 1,250 Megawatts (MW) of electricity ("ESJ Wind Project"). The end point in Jacumba was San Diego Gas & Electric's planned ECO Substation, which would then be connected with the 500-kV Southwest Powerlink transmission line. The intended result of the Project was to allow electricity generated by the ESJ Wind Project to be delivered into the U.S. power grid.[1]

DOE-issued Presidential permits are required before electricity transmission facilities may be constructed, operated, maintained, or connected at the U.S. Border. E.O. 10485 (September 9, 1953), as amended by E.O. 12038 (February 7, 1978). The DOE is responsible for receiving and reviewing applications and issuing permits. PP-334 was issued to ESJ following a review process that included an examination of the impacts of the Project as directed by the National Environmental Policy Act ("NEPA").

On December 26, 2012, Plaintiffs Protect Our Communities Foundation ("POC"), Backcountry Against Dumps ("Backcountry"), and Donna Tisdale (collectively "Plaintiffs"), filed suit for declaratory and injunctive relief. (ECF No. 1.) Plaintiff claims violations of NEPA, as well as the Endangered Species Act ("ESA"), the Migratory Bird Treaty Act ("MBTA"), the Bald and Golden Eagle Protection Act ("BGEPA"), and the Administrative Procedure Act ("APA").

Plaintiffs named Defendants Dr. Steven Chu and Jerry Pell in their official capacities as Secretary and Project Manager for the Department of Energy, respectively, as well as the Department of Energy ("DOE") itself. Plaintiffs also named Ken Salazar, as Secretary of the Interior; Karen Goebel, as Assistant Field Supervisor for Fish and Wildlife Service; and the Fish and Wildlife Service ("FWS"). All of these Defendants (collectively "Federal Defendants") have subsequently filed as one unit.

---

[1]     In April 2014, ESJ began construction of the Project, which is now complete. (ESJ Opp'n/Cross-Mtn. 19-20 n.11; Ostrander Decl. 1.)

On April 1, 2013, Energia Sierra Juarez U.S. Transmission, LLC, ("ESJ") filed, along with the original parties to the action, a joint motion for ESJ to intervene in the action. (ECF No. 8.) The Court granted the joint motion three days later. (ECF No. 9.) On April 11, 2013, Federal Defendants filed a motion to dismiss for lack of jurisdiction and failure to state a claim, which ESJ later joined. (ECF Nos. 10, 11.) The Court granted the motion in part and denied in part. (ECF No. 39.) Plaintiff filed an amended complaint on April 21, 2014. (ECF No. 45.) Both the Federal Defendants and ESJ filed answers on May 21, 2014. (ECF Nos. 46, 47.)

On September 18, 2014, Plaintiff POC moved to be dismissed from the suit and the Court granted the motion. (ECF Nos. 63, 66.) Two months later, the remaining Plaintiffs filed a motion for summary judgment. (ECF No. 74.) Both Federal Defendants and ESJ filed separate cross-motions for summary judgment, which also served as their respective oppositions. (ECF Nos. 75-78.) Plaintiffs countered by filing combined oppositions to Defendants' cross-motions and replies to Defendants' oppositions within the same documents. (ECF Nos. 81, 82.) Finally, Federal Defendants and ESJ each filed a reply to Plaintiffs' oppositions. (ECF Nos. 83-84.)

With all three motions for summary judgment fully briefed, the parties moved jointly for a stipulation that no statement of undisputed fact is necessary, which the Court granted. (ECF Nos. 85-86.) For the purpose of this order, the arguments presented in all three motions for summary judge, the responses, and replies have been considered and are ruled on herein.

## II.    LEGAL STANDARD

Challenges under the National Environmental Policy Act, the Endangered Species Act, the Migratory Bird Treaty Act, and the Bald and Golden Eagle Protection Act are governed by the Administrative Procedures Act. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004); 5 U.S.C. § 702.

Under the APA, a court should only overturn an agency action when it finds the action to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law…[or] without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A), (D). This standard of review is highly deferential to the agency and the reviewing court "is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) *overruled in part on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000). Courts should be at their most deferential when reviewing scientific or technical judgments within the agency's field of expertise. *Conservation Congress v. Finley*, 774 F.3d 611, 617 (9th Cir. 2014). However, courts "must not 'rubber stamp'… [agency actions which are] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 859 (9th Cir. 2004) (internal quotation and citation omitted).

Review of an agency decision is generally limited to the administrative record used by the agency in making the challenged decision. *Fence Creek Cattle Co. v. U.S. Forest Service*, 602 F.3d 1125, 1131 (9th Cir. 2010). Summary judgment is an appropriate "when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Conservation Congress*, 774 F.3d at 617 (citing *Karuk Tribe of Cal. V. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (*en banc*).

## III.   DISCUSSION

### A.   <u>Plaintiffs' Standing to Bring Claims</u>

A plaintiff must demonstrate adequate standing in order to bring a challenge to the action or inaction of a government body. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). Standing is established for an individual plaintiff when they can show (1) concrete, particularized, and imminent injury in fact; (2) the injury is fairly traceable to the actions of the defendant; and (3) it is likely that a favorable judicial decision will redress the injury. *Summers v. Earth Island Institute*, 555 U.S. 488, 492

(2009). The injury-in-fact element can be satisfied by an injury to aesthetic or environmental interests but "requires more than an injury to a cognizable interest. It requires that the party seeking review be [themselves] among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972).  The causation and redressability elements are closely linked. In order for a court to remedy a plaintiff's injury, the plaintiff must make clear to the court that the action or inaction at issue caused the injury. Without proof of causation, there can be no effective redress. Further, "once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed" *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572, n. 7 (1992). In *Cantrell*, the Ninth Circuit held that redressability (and, by extension, causation) does not require a demonstration that judicial intervention would change the ultimate outcome of the government action; only that judicial intervention will help the plaintiff enforce their procedural rights. *Cantrell*, 241 F.3d at 682.

An organization can gain associational standing for a challenge when (1) the organization's members would have standing on their own, (2) the interests at stake relevant to the organization's purpose, and (3) neither the claim nor relief requires specific individual members of the organization to participate. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000); *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 342-43 (1977). The first element of associational standing is self-explanatory: individual members of the organization must be capable of demonstrating standing for themselves. The second element is "undemanding" and requires "mere pertinence between litigation subject and organizational purpose." *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1158 (9th Cir. 1998) (quoting *Humane Soc'y of the United States v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1998)). Finally, the third component requires that the claim and relief sought are not particularized to a single member or group of members. *Hunt*, 432 U.S. at 344.

1   Standing is not a pleading requirement "but rather an indispensable part of the

2   plaintiff's case" and must be supported "with the manner and degree of evidence required

3   at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Therefore, while

4   general allegations are sufficient to survive a motion to dismiss, a plaintiff must produce

5   specific facts to support standing at the summary judgment phase. *Id.*; FED. R. CIV. P.

6   56(c),(e).

7   In the complaint, Plaintiffs alleged that the permit issued to ESJ by the DOE will

8   cause a loss of enjoyment and utility of the area on which the proposed electronic

9   transmission line would be built. (Compl. ¶¶ 14, 15, ECF No. 45.) Plaintiffs also alleged

10   that the "injuries are fairly tracable [*sic*] to the defendants' actions" and that in order to

11   remedy the injuries they ask for "injunctive, mandamus, and declaratory relief[.]"

12   (Compl. ¶ 16.) Plaintiffs alleged further facts regarding the effects of the Project

13   elsewhere in the complaint. (Compl. ¶ 23, *et seq.*) In the answers filed, neither Federal

14   Defendants nor ESJ directly challenged the factual assertions laid out by Plaintiffs,

15   except through general denials of the allegations. (Fed. Def. Answer, ECF No. 46; ESJ

16   Answer ECF No. 47.)

17   Plaintiffs did not address the issue of standing in their motion for summary

18   judgment. (Mot. Summ. J. ECF No. 74.) Federal Defendants challenged Plaintiffs'

19   standing to bring the claim in their combined opposition and cross-motion. (Fed. Def.

20   Opp'n/Cross-Mtn. 8, ECF No. 75-1.) With their combined opposition and reply, Plaintiffs

21   filed declarations which gave specific factual backing to the allegations set forth in the

22   complaint. (Pls.' Opp'n/Reply. ECF No. 82; Martin Decl.; Quintanar Decl.; Ostrander

23   Decl.; Tisdale Decl.) Federal Defendants claim that these declarations attached to

24   Plaintiffs' combined opposition/reply were not brought in a timely manner. (Fed. Def.

25   Opp'n/Cross-Mtn. 8, ECF No. 75-1 (citing *Klein v. City of Laguna Beach*, 983 F. Supp.

26   2d 1162, 1170 (C.D. Cal 2013)); Fed. Def. Reply 1, ECF No. 84 (citing *Sierra Club v.*

27   *E.P.A.*, 292 F.3d 895, 901 (D.C. Cir. 2002).) An argument first raised in a reply brief

28   need not be considered. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). However,

1   in *Zamani*, the Ninth Circuit's use of the language "need not consider" indicates that the

2   decision consider arguments or facts raised in a reply brief is, to some degree, at the

3   discretion of the trial court. *Id.* Here, Plaintiff did not bring a new argument but

4   responded with further evidence to assertions made by Federal Defendants in their

5   opposition/cross-motion. Further, due to the structure of the motion and cross-motion

6   filings in this case, Federal Defendants were given the opportunity to respond to the facts

7   asserted in the declarations. Because it was in response to an argument raised by Federal

8   Defendants and there was opportunity for response, the Court finds that the declarations

9   can be considered.[2]

10         The declarations filed by Plaintiffs are from Backcountry members Derik Martin,

11  Aaron Quintanar, and Mark Ostrander, as well as Plaintiff Donna Tisdale. (ECF No. 82.)

12  All declare that they were involved in some way with the public comment phase of the

13  DOE's permitting process. (Martin Decl. ¶ 1; Quintanar Decl. ¶ 1; Ostrander Decl. ¶ 1;

14  Tisdale Decl. ¶ 4.) Further, each of them elucidate specific harms they have suffered as a

15  result of the Project including, among others, decreased aesthetic enjoyment of scenery,

16  (Martin Decl. ¶¶ 4, 6) increased fire risk and associated property insurance rates,

17  (Ostrander Decl. ¶¶ 5, 6) loss of enjoyment of hiking and wildlife observation, (Quintanar

18  Decl. ¶¶ 3, 4) and loss of sightseeing and stargazing opportunities (Tisdale Decl. ¶ 12,

19  13.). In their reply, Federal Defendants challenge the assertion that the Project area was

20  largely in its natural state prior to the Project by highlighting that Interstate 8, the United

21  States/Mexico Border fence, and Southwest Power Link lines were already part of the

22  view. (Fed. Def. Reply 2, ECF No. 84.) Federal Defendant argue that Plaintiff has failed

23  to explain how the Project is "out-of-character with these pre-existing facilities[.]" *Id.*

24  The Court finds this argument disingenuous. Pre-existing disruptions of the natural

25

26  _____

27  [2]      Because she is the only Plaintiff bringing suit in an individual capacity, the Court necessarily
    considers arguments about individual standing in relation to Plaintiff Donna Tisdale. However, the
28  Court takes into consideration statements in the declarations of Martin, Quintanar, and Ostrander in
    order to determine whether or not Plaintiff Tisdale has standing

scenery do not prevent additional construction from harming the aesthetic value of an area. Because the ECO substation is much larger than the pre-existing transmission lines or border fence, those pre-existing disruptions do not preclude Plaintiffs' claim of injury stemming from the Project. (Martin Decl. Exhibit 2, ECF No. 82-4; AR 12700.) Further, Federal Defendants have not addressed the issue of increased fire hazard to the area so Plaintiffs' argument that the Project presents a danger of fire to the area remains uncontroverted in the record. (Ostrander Decl. ¶ 6.) For these reasons, the Court finds that Plaintiffs have indisputably demonstrated a particularized injury in fact.

Federal Defendants also assert that Plaintiffs have not adequately shown a causal relationship between the Project and the injury in fact, and any link is speculative. Plaintiffs counter that their injuries are a result of transmission towers that are part of the Project, which would not have been built absent DOE's approval of ESJ's permit. (Pls.' Reply/Opp'n 6, ECF NO. 82.)  The Court agrees with Plaintiffs. While the Court would not speculate as to a causal link between Defendants' actions and the harm, here Plaintiffs' argument only requires the completion of a syllogism. Because Federal Defendants have not proffered any evidence to contradict the premises laid out by the Plaintiffs, the Court deems that Plaintiffs have demonstrated that the Defendants' action is causal of the injury.

Federal Defendants also challenge that Plaintiffs have shown their injuries can be redressed by judicial intervention. The Court disagrees. Plaintiffs have asserted a procedural right guaranteed under NEPA was violated by the DOE's approval of ESJ's permit. This is enough to meet the standard of redressability. *Cantrell*, 241 F.3d at 682; *Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768, 779 (9th Cir. 2006). Having satisfied all three elements, Plaintiffs have established individual standing for Plaintiff Donna Tisdale.

Plaintiffs have also shown associational standing for Backcountry. Given that Donna Tisdale has shown individual standing, the first prong of associational standing is satisfied. As to the second prong, Federal Defendants did not challenge that the

8

environmental issues are germane to Backcountry's purpose as an organization. The Court finds that bringing suit in this instance is within the ambit of Backcountry's stated purpose of "address[ing] other major projects that threaten . . . [the] overall rural quality of life and community character" enjoyed by Backcountry's members. (Tisdale Decl. ¶ 3.) Therefore, Plaintiffs have proven the second element of organizational standing. Finally, Federal Defendants did not show that the relief sought by Plaintiffs requires the participation of certain members. Based on assertions made in the complaint and Plaintiffs' combined opposition and reply, the Court sees the issue as pertinent to any or all of Backcountry's members, not just a select and definite group of them. Having already determined that individual members do have standing and the suit is related to Backcountry's purpose, Plaintiffs have shown that Backcountry does indeed have associational standing.

For the foregoing reasons, the Court finds that Plaintiffs have demonstrated that Donna Tisdale has individual standing and Backcountry has associational standing. Accordingly, the Court denies Federal Defendants' motion with respect to standing to bring the present claim.

## B. Claims Under National Environmental Protection Act

### 1. Purpose and Need Statement of the FEIS

In their motion for summary judgment Plaintiffs argue that the purpose and need statement in the FEIS prepared by the DOE was impermissible. Plaintiffs contend that in describing the purpose and need for the FEIS as "to respond to the ESJ request for a Presidential permit," the DOE violated NEPA because it did not state a public purpose or demonstrate actual need, and was defined so narrowly as to restrict the scope of the FEIS. (AR 12561; Pls.' MSJ P's & A's 4, 6) Both ESJ and Federal Defendants contend that the purpose and need statement was reasonable. They argue that responding to a permit request is a valid purpose and that no showing of a public need is required. (Fed. Defs.' Opp'n/MSJ P's & A's 8; ESJ Opp'n/MSJ P's & A' 8.) Defendants further contend that

the purpose and need statement did not prevent the assessment of proper alternatives. (Fed. Defs.' Opp'n/MSJ 10; ESJ Opp'n/MSJ 9.)

Under NEPA, agencies must take a "hard look" at the environmental consequences of any proposed action before moving forward. *Native Ecosystems Council v. Weldon*, 697 F. 3d 1043, 1051 (9th Cir. 2012). This burden is procedural rather than substantive. *Id*. "For any proposed major federal action… NEPA requires the agency to prepare an [EIS]." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2004). Courts must give deference to an agency's expertise in regards to factual determinations, *see Alaska Survival v. Surface Transp. Bd.* 705 F.3d 1073, 1087 (9th Cir. 2013). The validity of an agency's EIS is a legal question and is evaluated under an arbitrary and capricious standard. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004); *see also Lands Council*, 395 F.3d at 1026, n. 5.

In the EIS, agencies must give a purpose and need statement that "shall briefly specify the underlying purpose and need to which the agency is responding[.]" 40 C.F.R. § 1502.13. An EIS must also "rigorously explore and objectively evaluate all reasonable alternatives [to a project,] and for those alternatives which [are] eliminated from detailed study, briefly discuss the reasons for [the alternatives] having been eliminated." 40 C.F.R. § 1502.14(a). The purpose and need statement sets the parameters for what alternatives an EIS will consider. *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997); *see City of Angoon v. Hodel*, 803 F.3d 1016, 1021 (9th Cir. 1986). Agencies are given broad discretion to define the purpose of their actions and may permissibly adopt private interests as part of the purpose and need stated in the EIS. *See Alaska Survival*, 705 F.3d at 1084-85. Nevertheless, agencies may not give a purpose and need statement "so unreasonably narrow that [alternatives would be eliminated and] the EIS would become a foreordained formality." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2009) (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998)). Agencies "should always consider the views of Congress… in the agency's

statutory authorization to act[.]" *Nat'l Parks*, 606 F.3d at 1070 (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991).

Because NEPA requires agencies to "specify the *underlying* purpose and need to which the agency is responding," 40 C.F.R. § 1502.13 (emphasis added), and Executive Order No. 10,485 requires that the DOE must determine an action to be in the public interest before issuing a permit,[3] 18 Fed. Reg. 5397 (1953), *as amended by* Exec. Order No. 12,038, 43 Fed. Reg. 4957 (1978), agencies should speak to broader considerations than simply the permit application when stating the purpose and need for an action. However, a purpose and need that is too narrow would not be dispositive in and of itself. If the statement were narrowly drawn, but every alternative were still considered, then the purpose and need could hardly have caused a defect in the EIS. Thus, the ultimate question is whether the purpose and need statement improperly foreclosed consideration of alternatives. *Westlands Water Dist. v. Dep't of the Interior*, 376 F.3d 853, 867 (9th Cir. 2004).

In this instance, the DOE gave little indication of an underlying reason for undertaking the FEIS other than ESJ's permit application. (AR 12561.) The purpose and need statement posits that the DOE "considers the impact of the proposed action and identified alternatives on the environment pursuant to NEPA, the proposed action's impact on the reliability of the U.S. electric power supply system, and any other factors that the DOE may consider relevant." *Id.* These are generalities applicable to any DOE permitting action and have no unique bearing on the ESJ permit request. Because of this, the Court concludes that the purpose and need statement is too narrowly drawn and focused almost exclusively on private interests. However, as stated above, a purpose and need statement must actually forestall consideration of alternative actions in order to violate the procedural requirements of NEPA. In this case, it did.

---

[3]     Defendant ESJ is correct in arguing that the public interest is distinct from a public need. However, the two are intertwined; a project for which there is no demonstrable public need is far less likely to be in the public interest.

> Commenters asked for consideration of distributed small-scale electricity generation, such as solar panels in urban settings, as an alternative to large-scale wind energy development and associated long-distance transmission lines. Alternative approaches for energy generation are outside the scope of the EIS because they do not respond to DOE's purpose and need, which is to respond to the ESJ request for a Presidential permit.

(AR 12491, 12569, *et seq.*) This passage, presented in slightly altered forms throughout the record, comprises the entire discussion of distributed electricity generation as an alternative. Citing the narrow construction of the purpose and need, DOE discounted distributed generation without consideration. This is relevant because if distributed generation were a viable alternative for generating the electrical power to be provided by the ESJ project, then the ESJ Project could become unnecessary and therefore no longer be in the public interest.[4] A properly drawn statement of need and purpose would lead to consideration of all possible alternatives to the proposed action.

The Court does not make a substantive decision that distributed generation is a viable alternative to the electrical power provided by the Project. However, based on the record, the DOE did not "briefly discuss the reasons for [distributed generation] having been eliminated" from detailed study. 40 C.F.R. § 1502.14(a). Instead, the DOE summarily used the purpose and need statement to determine that distributed energy falls outside the scope of responding to ESJ's request for a permit. Accordingly, the Court finds that the purpose and need statement was not proper because it defined the scope of the FEIS in such a way as to limit the consideration of alternatives to the Project.

---

[4]   ESJ argues that even if the DOE had found distributed energy to be a preferable alternative to the Project, DOE would have no authority under Executive Order 10,485 to deny the permit application because of that. (ESJ Reply 4.) This is illogical. Executive Order 10485 states that the DOE can issue applications that are "consistent with the public interest[.]" 18 C.F.R. 5397. If the DOE determines that there are much better alternatives than the one presented by the applicant then that obviously has a profound effect on whether or not the proposed action is actually in the public interest.

ESJ maintains that distributed energy as an alternative to wind projects has been previously rejected by courts in this District as falling outside the scope of permit applicants' objectives. (ESJ Reply 3); *Protect Our Cmtys. Found. v. Salazar*, No. 12-CV-2211 2013 WL 5947137 (S.D. Cal. Nov. 6, 2013) (Curiel, J.); *Protect Our Cmtys. Found. v. Jewell*, No. 13-CV-575 2014 WL 1364453 (S.D. Cal. Mar. 25, 2014) (Sammartino, J.). However, both *Salazar* and *Jewell* are different from the present case. In *Salazar*, the Bureau of Land Management, the agency which prepared the EIS, gave a more concrete purpose and need statement which gave specific reasons why the proposed action would further the BLM's objectives. *Salazar*, 5947137 at 4. Further, the BLM "carefully evaluated" eighteen alternatives and "provided an explanation as to why [some alternatives] were eliminated from detailed analysis[.]" *Id.* at 5. The dismissal of distributed energy as an alternative in *Salazar* was thus appropriate because BLM gave the alternative consideration and then presented an explanation based on more than just the narrow goals of the applicant. In *Jewell*, the BLM likewise gave a more informative purpose and need statement describing how the proposed project would help the BLM. *Jewell*¸ 1364453 at 3-4. Additionally, the BLM "determined that the distributed generation did not merit in-depth study because it fails to fulfill several Project objectives and is infeasible from a regulatory, technical, and commercial perspective." *Id.* at 6. This explanation far outstrips in detail anything presented by the DOE in the instant case. For these reasons, *Salazar* and *Jewell* do not preclude the Court from finding that the DOE's preparation of the FEIS was procedurally deficient in this instance.

In light of the foregoing, the Court grants Plaintiffs' motion regarding the purpose and need statement of the FEIS and denies Defendants' motion as to the same.

## 2. Extraterritorial Effects of the Permitting Action

Backcountry contends that the DOE violated NEPA by failing to consider extraterritorial effects of the Project and by not addressing effects of the ESJ Wind Project in the FEIS. Defendants contend that extraterritorial effects need not be taken into consideration and that the ESJ Wind Project did not need to be assessed in the FEIS. The

Court sees two distinct but interrelated issues here. First, whether or not the extraterritorial effects of the Project must be considered. Second, whether the effects of the ESJ Wind Project in both Mexico and the United States must be considered. The Court finds that the Project's effects, whether in the United States or Mexico, must be considered. However, the effects of the ESJ Wind Project need not be considered in the EIS for the Project.

### a. Extraterritorial Effects of The Project

Plaintiffs assert that the DOE failed to adequately assess the environmental impacts of the Project that would be felt in Mexico. Federal Defendants counter this and argue that the impacts of the Project in Mexico did not need to be considered in the FEIS. ESJ does not contest Plaintiffs' assertion and instead only disputes Plaintiffs arguments relating to the effects of the ESJ Wind Project.

Plaintiff argues that under NEPA, agencies must analyze extraterritorial effects of actions before they can issue a permit. This is correct. As the D.C. Circuit held in *Government of the Province of Manitoba v. Salazar*, 691 F. Supp. 2d. 37, 51 (D.D.C. 2010), agencies must take into account the effects of actions within the United States, even when those effects are felt across sovereign borders.

Federal Defendants' arguments to the contrary rely on a presumption against extraterritorial application of Congressional acts. Federal Defendants point to cases such as *Natural Resources Defense Council, Inc. v. Nuclear Regulatory Comm'n*, 647 F.2d 1345 (D.C. Cir. 1981), and *Greenpeace USA v. Stone*, 748 F. Supp. 749 (D. Haw. 1990), to show that NEPA is not to be applied extraterritorially. However, those cases are substantially dissimilar from the present situation. In *NRDC*, the court held that the Nuclear Regulatory Commission did not need to analyze what effects the export of nuclear material could have on the recipient country. *NRDC*, 647 F.2d at 1348. This is far different than the present case, not least because the export of nuclear materials is subject to its own regulatory standards per the Nuclear Non-Proliferation Act. In *Greenpeace*, the court held that the U.S. army did not have to consider the effects of transporting

munitions across West Germany. *Greenpeace*, 647 F.2d at 752-53. The Court thinks that the United States Army transporting nerve gas across Europe during the twilight of the Cold War to be very different from the situation presented here. The Court finds that the factual circumstances in these cases account for NEPA not being applied, rather than a presumption against extraterritoriality.

The most factually similar case that Federal Defendants rely on is *Consejo de Desarrollo Economico de Mexicali, AC v. United States*, 438 F. Supp. 1207 (D. Nev. 2006), *vacated and remanded on other grounds*, 482 F.3d 1157 (9th Cir. 2007). There, the court ruled that the Bureau of Reclamation was not required to analyze what effects a canal lining project in the United States would have in Mexico. *Consejo*, 438 F. Supp. 2d at 1236-37. Plaintiffs make the thin differentiation that decisions on water allocation by the Mexican government, not changes` in water levels in Mexican aquifers as a result of the canal lining project, was the proximate cause of the effects in questions.

While the Court is not entirely convinced by Plaintiffs' assertions that the factual situation in *Consejo* is greatly different from the one here, neither does the Court agree with the conclusion drawn in *Consejo* that NEPA does not apply extraterritorially. *Consejo*, 438 F. Supp. 2d at 1236 (stating that there was no "clear statutory intent" for an extraterritorial application of NEPA to effects in Mexico.). Though there is not a clear statement that NEPA applies in all situations, the plain language states that agencies should consider the actions affecting the "human environment" and "worldwide and long-range character of environmental problems." 42 U.S.C. § 4332(2)(C), (F). This illustrates that Congress intended for agencies, when possible, to consider environmental concerns outside of U.S. borders.

The Council on Environmental Quality ("CEQ") guidelines support this interpretation as well. A 1997 Memorandum states that "agencies must include analysis of reasonably foreseeable transboundary effects of proposed actions in their analysis of proposed actions in the United States." (CEQ Memorandum July 1, 1997, available at https://ceq.doe.gov/nepa/regs/transguide.html, last accessed Aug. 20, 2015.)  Further,

refusing to apply NEPA to actions with extraterritorial effects would create a situation where agencies are required to assiduously consider effects of a proposed action right up until the border fence, but effects a few yards away in Mexico are immaterial. For these reasons, the Court finds it more appropriate to invoke the presumption against absurdity than one against the extraterritoriality of legislation.

For these foregoing reasons, the DOE was responsible for analyzing the impact that the Project would have on either side of the border. Plaintiffs are correct in asserting that the effects of the Project in Mexico must be assessed. However, Plaintiffs do not satisfactorily demonstrate how the analysis performed by the DOE in the FEIS was deficient. Most of the impacts which Plaintiffs claim were ignored in the FEIS were effects of the ESJ Wind Project and not the Project. Though the Court finds Plaintiffs' legal argument persuasive, because they have not pointed to any factual error in the evaluation of the Project, there is not enough substance to find for the Plaintiffs. Accordingly, the Court denies the motions of both parties with respect to the extraterritorial effects of the Project.

### b. Effects of ESJ Wind Project

Plaintiffs also contend that the DOE was required by law to analyze impacts of the ESJ Wind Project in both the United States and Mexico. The argument is largely premised on the close relationship between the Project and ESJ Wind Project. Defendants respond that DOE's authority to regulate is limited to the Project and so requiring an evaluation of the ESJ Wind Project would be improper. Defendants also contend there is not a strong enough relationship between the Project and ESJ Wind Project to merit consideration of the effects of the latter. Here, the Court finds that the causal relationship between the two is insufficient to require detailed evaluation of the ESJ Wind Project.

The dispositive case on this issue is the Supreme Court ruling in *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004). In *Public Citizen*, the President announced an intention, upon promulgation of new regulations by the Federal Motor Carrier Safety Administration, to lift a moratorium on Mexican trucking companies

operating within the United States. *Public Citizen*, 541 U.S. at 760. The Court held that although the regulations were antecedent to the lifting of the moratorium, the FMCSA did not have authority to prevent Mexican companies from operating in the United States and therefore, the President's decision to lift the ban, rather than the FMCSA regulations, was the proximate cause of additional motor carrier traffic within the United States. *Id.* at 766-67. The Court further held that "a 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA[.]" *Id.* This plain statement makes clear that there must be a showing of proximate cause before an agency is required to evaluate something as an effect of agency action.

Plaintiffs contend that there is a stronger relationship between the ESJ Wind Project and the Project than between the regulations and increased traffic in *Public Citizen*. They argue that the ESJ Wind Project must be evaluated as a connected action because the energy it generates would be delivered to the United States solely through the Project and the DOE maintains authority over the Project even after the permit is issued.

The most persuasive authority presented by Plaintiffs is *Border Plant Working Group v. Department of Energy*, 260 F. Supp. 2d 997 (S.D. Cal. 2003) (Gonzalez, J.). In *Border Plant*, Judge Gonzalez held that the effects of two turbines in a Mexican power plant had to be considered by the DOE because the turbines were configured entirely for the export of electricity to the United States along the transmission line which was the subject of the permitting request. *Border Plant*, F. Supp. 2d. at 1016-17. The Court considers the circumstances in the present case to be very similar; the ESJ Wind Project is configured to send power to the United States via the Project. AR 12474. The Court also believes both situations to demonstrate a tighter link between the permitted action and the effect at issue that is evident in *Public Citizen*.

However, even with a more evident relationship between cause and effect, Judge Gonzalez held that the transmission line in *Border Plant* was a "*but-for cause* of the generation of power at the [Mexican facility.]" *Border Plant*, 260 F. Supp. 2d. at 1017 (emphasis added). The Court agrees with this determination and finds that even if the sole

purpose of the ESJ Wind Project is the generation of power for the United States market, and the Project is the only conduit for that power, the Project cannot be considered a proximate cause of the ESJ Wind Project.

No small part of this determination is due to the fact that the DOE, nor any other United States governmental agency, can exert authority over whether or not the ESJ Wind Project is constructed. [5] That authority lies with the Mexican government. Even if there were no means for energy generated by the wind turbines to reach the United States, ESJ could still theoretically build the wind farm and leave it idle. Simply because the Project makes the ESJ Wind Project economically viable does not mean that the Project is a prerequisite to construction of the ESJ Wind Project.

Because the Project is a but-for cause of the ESJ Wind Project, under the standard laid out in *Public Citizen*, the DOE was not responsible for analyzing the effects of the ESJ Wind Project. Therefore, in regards to analysis of the effects of the ESJ Wind Project, the Court denies Plaintiffs' motion and grants Defendants' motions.

### 3.  Significant Environmental Impacts of the Project

The EIS prepared by an agency must present a "full and fair discussion of significant environmental impacts" of the proposed action. 40. C.F.R. § 1502.1. If information essential to presenting such a discussion is incomplete or unavailable, the agency must obtain the information through independent research unless the cost of doing so would be prohibitive. 40 C.F.R. § 1502.22; *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1249 (9th Cir. 1984). In reviewing an EIS, courts make a "pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." *National Parks*, 606 F.3d at 1072 (quoting *State of California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)).

/ / /

---

[5]    The Court finds that the DOE's lack of authority over the ESJ Wind Project is a factor in determining causality, rather than a stand-alone legal issue.

### a. Noise Impact on Songbirds

In their prior Motion for Summary Judgment, Plaintiffs asserted that the DOE failed to adequately assess the impact of the Project on songbirds. Plaintiffs stated that the decibel threshold used by the DOE in determining whether the Project would be harmful to songbird populations was "outdated and erroneously high[.]" (Pls. MSJ P's & A's 14.) Plaintiffs subsequently withdrew their claim because they could not reference testimony required to rebut the assertions made by Defendants in their combined oppositions and cross-motions for summary judgment. (Pls. Reply/Opp'n to ESJ's Cross-Mtn 12 n.2.) Therefore, the Court does not fully consider the issue here.

However, the Court does find that the claims that the DOE ignored comments regarding the impacts on songbirds to be unfounded. First, the FEIS stated that the 60 decibel threshold was drawn from County of San Diego Guidelines which were in turn based on a study conducted at the University of California at Davis. (AR 12663.) Second, the FEIS addresses the argument about decibel levels affecting songbirds and finds the evidence unconvincing. (AR 13881.) "Disagreement does not render the [DOE's] review and comment process improper." *Earth Island Institute v. Carlton*, 626 F.3d 462, 473 (9th Cir. 2010). NEPA requires the Court "defer to agency opinion if it is not otherwise shown to be arbitrary or capricious." *City of Carmel*, 123 F.3d at 1151-52. Accordingly, the Court would likely not have found the FEIS lacking unless Plaintiffs were able to demonstrate a procedural defect, rather than just a disagreement between experts.

### b. Impacts on Peninsular Bighorn Sheep

Plaintiffs claim that the FEIS was deficient in its study of the impacts of the Project on populations of Peninsular Bighorn Sheep ("PBS").[6] Specifically, Plaintiffs contend that the DOE failed to conduct a study to determine the level of connectivity between PBS populations in the United States and Mexico, and the subsequent finding that the

---

[6]   Plaintiffs cite effects on PBS populations form both the Project and from the ESJ Wind Project. In light of the Court's above holding, only effects from the Project will be considered here.

Project would not adversely impact PBS populations was therefore based on inadequate information. Defendants maintain that such a study was unnecessary to determine the effects of the Project on PBS populations.

NEPA requires that an agency gather all information, by independent research if necessary, that "is *essential* to a reasoned choice among alternatives." 40 C.F.R. § 1502.22 (emphasis added). Here, the missing information was not essential to a determination because the FEIS had already determined that the Project would have little effect on the movement of PBS populations. (AR 12669.) If the Project would not impede the migration of the PBS populations, then the degree of interconnectivity between the populations in the United States and Mexico is irrelevant. For this reason, the Court agrees with Defendants that the DOE was under no obligation to conduct research on cross-border migration of PBS. The Court finds that Plaintiff has not shown an defect in the FEIS in regards to adverse impacts on Peninsular Bighorn Sheep.

### c.  Quino Checkerspot Butterfly

Plaintiffs last challenge under NEPA is that the DOE failed to use up-to-date survey protocol in determining whether or not the Project would interfere with the habitat of the Quino Checkerspot Butterfly ("QCB"). Defendants respond that survey methods used were adequate and there were no QCB host plants in the survey area.[7]

Plaintiffs first claimed that the survey data, relying on a 2002 FWS protocol, does not include consideration of *Collinsia concolor*, a host plant for QCB larvae. Citing *Seattle Audubon Society v. Espy*, 998 F.2d 699 (9th Cir. 1993), Plaintiffs maintain that not surveying specifically for *Collinsia concolor* means that the EIS was based on "stale scientific evidence" and is therefore invalid. However, there are differences between the factual situations in this case and that of *Espy*. In *Espy*, the Ninth Circuit upheld a district

---

[7]     ESJ also posited that the issue is now moot because the Project has been completed. The Ninth Circuit has specifically held against such arguments, stating that not doing so would allow parties to avoid complying with NEPA by completing projects before they could be challenged in court. *Oregon Natural Resources Council v. U.S. Bureau of Land Management*, 470 F.3d 818, 821 (9th Cir. 2006). Accordingly, the Court finds mootness inapplicable here.

12cv3062 L (JLB)

court ruling that an EIS was invalid because it did not take into account a report which challenged assumptions about spotted owl population declines that underscored the EIS at issue in the case. *Id.* at 703-04. By ignoring the report, the Forest Service disregarded evidence that the information informing its decision was incorrect.

Despite the result in *Espy*, the mere fact that new science is left unconsidered does not necessarily show a defect. If an EIS were to use older information, but all possible environmental impacts were nevertheless considered, then the older scientific evidence had no adverse impact on the EIS.[8] Thus, in this case, there must also be a showing that the non-inclusion of the *Collinsia concolor* in the list of QCB host plants meant an environmental impact was not contemplated in the FEIS. That *Collinsia concolor* was not found at the survey site, (nor were any QCB specimens) combined with the fact that the Project area is not its natural habitat, demonstrates to the Court that not including it as a QCB host did not affect the EIS. (AR 13229-32, 13251-54, SAR 14955.) If there was no *Collinsia concolor* to begin with, then there was no way for the DOE to consider the effects of its removal on whatever QCB population there may have been in the area. Plaintiff argues that the non-inclusion on the list of host plants could have meant the surveys were not thorough and that specimens of *Collinsia concolor* went unidentified. The Court finds this argument too speculative to be persuasive.

For the foregoing reasons, the Court finds that Plaintiffs' challenges regarding consideration of significant environmental impacts under NEPA fail to show a defect in DOE's FEIS. As such, the Court denies Plaintiffs' motion and grants Defendants' motions for summary judgment with respect to noise impacts on songbirds, effects on Peninsular Bighorn Sheep populations, and the data used for surveying Quino Checkerspot Butterfly habitats.

---

[8]     Although NEPA is meant to enforce procedural rights, the Court finds that there must be some basis for believing that a deviation from the precise procedures laid out in NEPA resulted in some actual deficiency in the EIS. As a narrowly drawn purpose and need statement must be shown to have actually forestalled consideration of alternatives, so too must stale scientific data be shown to cause a defect in consideration of alternatives.

1    **C. Claims Under the Endangered Species Act**

2        Plaintiffs claim that Defendant Fish and Wildlife Service violated § 1536 of the

3    Endangered Species Act by not providing DOE with the most up-to-date scientific data

4    regarding Quino Checkerspot Butterfly host plants. 16 U.S.C. § 1536(a)(2). Defendants

5    contend, *inter alia*, that the FWS did not make a final, reviewable action.

6        The Court first finds that the inaction on the part of FWS is not reviewable under

7    the ESA. *See Bennett v. Spear*, 520 U.S. 154, 171-72 (1997). The Court held in *Bennett*

8    plainly states that §1536 claims "are obviously not reviewable under [the citizen-suit

9    provision of the ESA.]" Though the *Bennett* Court went on to find that § 1536 claims

10   were reviewable under the APA, Plaintiffs did not move for summary judgment on those

11   grounds and so the Court does not review those claims in detail here.

12       The Court does note that Plaintiffs' claims under § 1536 of the Endangered Species

13   Act rely on the inadequacy of the QCB survey data provided to the DOE by FWS. As

14   discussed above, the Court finds that not including *Collinsia concolor* on the list of QCB

15   host plants did not have a demonstrable effect on the preparation of the FEIS by DOE.

16   For a successful claim based on §1536, Plaintiff would need to point to inadequate

17   information provided by FWS that led to the DOE preparing a deficient FEIS.

18       For the foregoing reasons, Plaintiffs claims under the Endangered Species Act fail.

19   The Court denies Plaintiffs' motion for summary judgment under the ESA and grants

20   Defendants' motion for summary judgment with regards to the same.

21   **D. Claims Under the Migratory Bird Treaty Act and the Bald and Golden**

22       **Eagle Protection Act**

23       Plaintiffs claim that the DOE violated the Migratory Bird Protection Act

24   ("MBPA") and the Bald and Golden Eagles Protection Act ("BGEPA"). Plaintiffs allege

25   that by failing to obtain permits for accidental take of protected eagles prior to issuing the

26   permit to ESJ, the DOE was in violation of the MBTA and BGEPA. Defendants respond

27   that DOE was not obliged to obtain a license for accidental take prior to issuing a permit

28   to ESJ.

The Court first notes that Plaintiffs' claims under the MBTA and BGEPA are factually based, to a large degree, on the effects that the ESJ Wind Project will have on protected avian species. (Pls. MSJ P's & A's 22 (citing *e.g.* AR 12497, 12483, 12677).) Plaintiffs are correct in pointing out that the MBTA was the codification of an international treaty, and should therefore be applied to actions that affect protected birds outside of U.S. borders. *See* 16 U.S.C. § 703(a); *see also* 66 Fed. Reg. 3853. However, as discussed above, the Project cannot be consider causal of the ESJ Wind Project because the latter is outside the control of the DOE or any other branch of the United States government. Therefore, Plaintiffs cannot rely on the impact of the ESJ Wind Project on protected avian species to demonstrate that issuance of a permit for the Project will result in the killing of eagles or migratory birds. Any evidence that Plaintiffs use to support their assertion must be traceable to the Project and the Project alone.

The MBTA provides it "unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill…any migratory bird[.]" 16 U.S.C. § 703(a). The MBTA is a criminal statute enforced by the FWS but private citizens can bring a cause of action under the APA for violation of the MBTA. 16 U.S.C. §§ 706, 707; *City of Sausalito*, 386 F.3d 1186, 1203-04 (9th Cir. 2004). The BGEPA states that anyone who "shall knowingly, or with wanton disregard for the consequences of his act take…any bald eagle" is subject to criminal penalties. 16 U.S.C. § 668. Both the MBTA and the BGEPA allow for the Secretary of the Interior to permit the taking of protected birds under certain circumstances. 16 U.S.C §§ 668a, 704. In September of 2009, FWS published a rule which allows for "permits to take eagles where the taking is associated with, but not the purpose of, otherwise lawful activities[.]"*Jewell*, 1364453 at 20 (citing 50 C.F.R. § 22.26; 74 Fed. Reg. 46836). The Court finds that the FWS delineating a difference between direct taking and incidental taking shows that the agency means the two types of taking should be treated differently. Therefore, the reference that Plaintiffs make to *Glickman* is not analogous to the situation here. *Humane Society of the U.S. v. Glickman*, 217 F.3d 882 (D.C. Cir. 2000).

In *Glickman*, the Department of Agriculture implemented a plan which involved directly taking geese populations by intentionally killing geese during their summer molt when they were incapable of flying. *Id.* at 884. Here, the DOE merely approved a permit to a third party which could cause the death of protected avian species. Not only was the action by the DOE done in a purely regulatory capacity, the foreseeable takings by resulting from the Project would be properly categorized as indirect. Because of the differences in the factual situations and the rule regarding indirect take promulgated by FWS, the Court finds that the DOE was not required to obtain a permit under either MBTA or BGEPA prior to issuing a the permit for the Project.

For the foregoing reasons, the Court holds that the DOE was not in violation of either the Migratory Bird Treaty Act, or the Bald and Golden Eagle Protection Act, when it issued a permit to ESJ. Accordingly, the Court denies Plaintiffs' motion as to the MBTA and BGEPA. The Court grants Defendants' motion for summary judgment

## IV.   CONCLUSION & ORDER

Based on the foregoing, the parties' cross motions for summary judgment are **GRANTED IN PART and DENIED IN PART** as follows:

1. Regarding Plaintiffs' standing, Defendants' motion is **DENIED**;

2. Regarding the Purpose and Need Statement, Plaintiffs' motion is **GRANTED**; Defendants' motion is **DENIED**;

3. Regarding the Extraterritorial Effects of Permitting Action, Plaintiffs' and Defendants' motions are **DENIED**;

4. Regarding the Effects of the Wind Project, Plaintiffs' motion is **DENIED**; Defendants' motions are **GRANTED**;

5. Regarding Significant Environmental Impacts, Plaintiffs' motion is **DENIED**; Defendants' motions are **GRANTED**;

6. Regarding violations of the Migratory Bird Treaty Act, and the Bald and Golden Eagle Protection Act, Plaintiffs' motion is **DENIED**; Defendants' motions are **GRANTED**.

1   The parties are directed to jointly contact the Chambers of Magistrate Judge Jill L.

2   Burkhardt within five days of the filing of this Order to schedule a conference to discuss

3   further proceedings.

4   **IT IS SO ORDERED.**

5

6   Dated:  September 29, 2015

7

8   Hon. M. James Lorenz
    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12cv3062 L (JLB)