UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BACKCOUNTRY AGAINST DUMPS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JAMES RICHARD PERRY, in his official capacity as Secretary of the United States Department of Energy, et al., <br><br> Defendants. | Case No.: 3:12-cv-03062-L-JLB <br><br> **ORDER ON REMEDY** |

Pending before the Court is Plaintiffs' motion [Doc. 116] for vacatur or a preliminary injunction as a remedy for Defendant United States Department of Energy's violation of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*. The Court decides the matter on the papers submitted and without oral argument. See Civ. L. R. 7.1(d.1). For the reasons stated below the Court **DENIES** Plaintiffs' requested relief and **REMANDS** this dispute to the United States Department of Energy.

//
//
//
//

## I. BACKGROUND

This dispute arises out of the construction and operation of a commercial wind farm ("Wind Farm") in La Rumorosa, a town in Northern Baja California, Mexico, and a transmission line that straddles the international border to connect the Wind Farm to an electrical substation in Jacumba, California.[1] The transmission line runs approximately 1.65 miles in total. Roughly .65 miles of the transmission line stands on U.S. soil (the "U.S. Line"), and roughly one mile stands on Mexican soil (the "Mexico Line"). The Wind Farm is a nine figure investment capable of generating enough clean, renewable energy to power 65,000 average households.

Plaintiffs are the Protect Our Communities Foundation ("POC") and Donna Tisdale. Both Donna Tisdale and many of the individual members of POC reside in Western Imperial County and Eastern San Diego County and allege that the construction and operation of the Project has harmed their enjoyment of the local environment. The owner of the Wind Farm is intervenor Defendant Energia Sierra Juarez U.S. Transmission, LLC ("ESJ"). ESJ transmits all of the power that the Wind Farm generates to the substation in Jacumba, CA. From there, San Diego Gas and Electric ("SDGE") distributes the power into the U.S. power grid. Because the transmission line connects at the international border, ESJ had to obtain a presidential permit prior to construction or operation. E.O. 10485 (September 9, 1953), as amended by E.O. 12038 (February 7, 1978).

Defendant United States Department of Energy ("DOE") is the federal agency in charge of issuing such permits. The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, required DOE to conduct an environmental review and prepare an Environmental Impact Statement ("EIS") before issuing the permit. DOE undertook an

---

[1] As used in this Order, "Wind Farm" refers to the wind turbine facility in Mexico; "U.S. Line" refers to the .65 mile stretch of power line between the ECO Substation and the border; "Mexico Line" refers to the one mile stretch of power line between the border and the ESJ Wind Farm; the "Project" refers to the aggregate of the U.S. Line, the Mexico Line, and the ESJ Wind Farm.

environmental review and published a Final Environmental Impact Statement ("FEIS) in May 2012. On August 31, 2012, DOE issued a presidential permit ("PP-334") authorizing ESJ to connect the transmission lines across the international border. On December 26, 2012, Plaintiffs filed a complaint seeking declaratory and injunctive relief for violations of a number of environmental laws. In October 2013, about ten months after Plaintiffs filed their complaint, construction of the Wind Farm commenced. In April of 2014, construction of the U.S. Line commenced. Commercial operation commenced in April 2015. Plaintiffs never sought preliminary injunctive relief after filing their complaint.

After two rounds of summary judgment, only Plaintiffs' NEPA claim remains. The Court has already held that the NEPA claim is meritorious. Specifically, the Court found that the FEIS prepared by DOE was inadequate, and thus violated NEPA, in two respects: (1) The FEIS purpose and need statement was overly narrow and thus foreclosed consideration of distributed power generation as an alternative to the Project and (2) the FEIS failed to consider the environmental impacts upon Mexico of the U.S. Line, the Mexico Line, and the Wind Farm.

The issue before the Court now is the proper remedy for these NEPA violations. Both parties agree that the Court must remand this case to DOE for preparation of a Supplemental Environmental Impact Statement ("SEIS") that satisfies NEPA. However, disagreement exists as to whether the Court should prohibit continued Project operation during the interim, remand period. Specifically, Plaintiffs seek vacatur of PP-334 and / or a permanent injunction requiring Defendants to disconnect the line at the border until DOE publishes a valid SEIS. Defendants, by contrast, urge the Court to exercise its equitable discretion and allow continued Project operation during the remand period.

//
//
//
//

## II. VACATUR

The Administrative Procedures Act ("APA") provides that a "reviewing court shall… hold unlawful and set aside (A) agency action, findings, and conclusions found to be . . . arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] (D) without observance of procedure required by law. 5 U.S.C. § 706(2)(A),(D). However, the APA also provides that, in making such determinations, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. Under Plaintiff's reading of § 706, a court has no discretion but to vacate any agency action found to be unlawful. Thus, Plaintiffs argue, because the Court has already found a violation of NEPA, the Court has no discretion and must vacate PP-334.

Plaintiffs are incorrect. It is true that vacatur is the *normal* remedy for unlawful agency action. *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). That said, an order of vacatur does not mechanically follow from an APA violation. Rather, a court must consider principles of equity to determine whether the facts warrant vacatur. *Id*. Specifically, a court must balance the seriousness of the agencies errors against "the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics v. U.S. Env't Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012) (*citing Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

In *Cal. Cmty's Against Toxics*, the Ninth Circuit expressly adopted the D.C. Circuit's metric for measuring the seriousness of an agency's error. *Toxics*, 688 F.3d at 989 (*citing Allied-Signal*, 988 F.2d at 150-51.) Under this approach, an error's seriousness is coextensive with the extent to which the error creates doubt as to whether the agency made the correct decision. *Allied-Signal*, 988 F.2d at 150-51. As explained above and in the Court's previous summary judgment orders, DOE made two procedural errors.

First, DOE drafted the purpose and need statement in an overly narrow manner such that it foreclosed consideration of distributed power generation as an alternative to

4

the Project.  This procedural error, however, appears to be without substantive consequence.  Distributed generation refers to generation of power closer to the point of consumption, often taking the form of rooftop solar panels or local processing of renewable energy sources.  In October of 2011, the Bureau of Land Management ("BLM") and the California Public Utilities Commission ("CPUC") jointly prepared an environmental impact statement in connection with a proposed utility-scale wind farm on federal land about 70 miles east of San Diego.[2]  The EIS rejected distributed generation as an alternative because it was infeasible from a technical and commercial perspective that distributed generation could produce a meaningfully comparable level of clean energy as a utility scale wind farm.  *Protect our Cmtys. Found. v. Jewell,* 2014 WL 1364453 *6 (S.D. Cal. 2014).

This conclusion that distributed power generation is not a feasible alternative to a utility scale wind farm has withstood scrutiny by both this district and the Ninth Circuit.  *Protect our Cmtys. Found. v. Jewell,* 2014 WL 1364453 *6; 825 F.3d 571, 581 (9th Cir. 2016).  On remand, DOE will be entitled to rely on this analysis.  *Center for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1012 (9th Cir. 2011) (finding it proper to rely on a prior review's elimination of a specific alternative where the EIS expressly states such reliance).  Thus, it seems highly unlikely that DOE's failure to consider distributed power generation caused an erroneous decision.

The second error committed by DOE was its failure to consider in the FEIS the environmental impacts the Project would have upon Mexico.  This too seems unlikely to have caused DOE to make an incorrect decision.  The Mexican Ministry of Environmental Natural Resources ("MMENR") reviewed the impacts the Project would have upon Mexico and granted approval.  AR 4563, 12483, 12489.  Specifically, MMENR conducted an environmental review that involved (1) identifying environmental

---

[2] EIS located at http://www.cpuc.ca.gov/environment/info/dudek/ecosub/eco_final_eir-eis.htm.

impacts and mitigation measures, (2) publishing findings for review and consultation, and (3) consideration of commentary from both governmental and non-governmental participants. (Barajas Decl. ¶¶ 9–12.) The process also involved MMENR consideration of an 850 page document (produced over a two year period by ESJ and made available for public comment) that details the Project's impacts on the Mexican environment and describes mitigation measures. Id. ¶¶ 19–22. This environmental review process culminated in the production of an official document called an Environmental Impact Authorization ("EIA"). The EIA documents environmental impacts, mandates various mitigation measures, and authorizes construction of the Mexican portion of the Project. (Id. ¶¶ 18, 20.)

On remand, DOE will be entitled to attach and incorporate by reference any environmental documents prepared by the Government of Mexico or the United States. *See Swiminomish Tribal Cmty. v. Fed. Energy Comm'n*, 627 F.2d 499, 511–12 (D.C. Cir. 1980) (holding it appropriate to incorporate in an EIS an environmental report prepared in part by the Canadian government that discussed environmental impacts a project would have upon the environment in Canada). Furthermore, given MMENR's reasoned conclusion that the Project's impacts upon the Mexican environment are acceptable, and given that Plaintiffs have not articulated any valid reason to suspect problems with the methodology of the Mexican Government's environmental review process, it seems unlikely that DOE's remand consideration of these environmental impacts should trigger a different result. Accordingly, the Court finds that DOE's NEPA violations are not serious.

While the errors are not serious, vacatur would be highly disruptive. As described more fully in Section III below, vacatur would disrupt (1) a substantial flow of clean, renewable energy, (2) a substantial revenue stream to both ESJ and members of the Mexican agricultural community collective that lease their land to ESJ, and (3) a number of paying jobs. Vacatur could also decrease power grid reliability. Thus, balancing the seriousness of the errors against the disruptive consequences of vacatur, the Court finds
6
3:12-cv-03062-L-JLB

vacatur unwarranted on these facts. The Court therefore **DENIES** Plaintiffs' request for vacatur.

### III. PERMANENT INJUNCTION

In the alternative, Plaintiffs seek permanent injunctions prohibiting continued operation of the project and / or further expansion of the Wind Farm during the remand period. A four factor test governs a court's determination as to whether a permanent injunction should issue. To merit a permanent injunction, a plaintiff must show

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (internal citations and quotation marks omitted).

#### A. Continued Operation

In support of their prayer for an injunction halting Project operation, Plaintiffs list a number of purported environmental harms stemming from both construction and operation. However, construction is complete, and Plaintiffs do not seek removal of any of the constructed facilities. Because Plaintiffs' requested remedy thus does not aim at any harms resulting from the construction of the Project or from the continued existence of its physical structures, such harms are not the proper focus of the present analysis. Nor is it proper to focus on any general environmental harms from continued operation that are not suffered by Plaintiffs. *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1025–26 (E.D. Cal. 2013) (*citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190–81 (2000)). Rather, the Court's analysis need only consider harms (1) from continued operation that (2) accrue to Plaintiffs.

Such operational harms appear to include only those stemming from maintenance

vehicle traffic and fire hazard.[3] More specifically, the FEIS notes that ongoing maintenance would require the weekly use of two utility vehicles and this will "result in the emission of small quantities of dust and exhaust emissions. The emissions resulting from the relatively few trips required for line maintenance would be of a de minimis nature and would occur infrequently, but last for the life of the project." AR 12776, 12869 (quote). Plaintiff has presented no evidence tending to suggest that the emissions and dust disturbance from the infrequent use of a couple maintenance vehicles will cause them irreparable harm for which there is no adequate remedy at law. Accordingly, the Court finds Plaintiffs' maintenance vehicle argument unpersuasive.

More persuasive is Plaintiffs' argument concerning fire hazard. The FEIS notes that Project operation could cause a wildfire if hardware explodes; conductors crossover; dust or dirt on insulators cause flashover; or if vegetation, debris, or any airborne object comes into contact with energized conductors. AR 12799–800. Furthermore, Mark Ostrander, a member of Plaintiff Backcountry Against Dumps who is a fire suppression expert, submitted a declaration on the topic. (Ostrander Decl. [Doc. 121-2].) In his declaration, Ostrander mostly repeats observations made in the FEIS. To wit, that continued operation could ignite a fire and that a fire in the Greater San Diego area could become severe. Ostrander also states that continued electrification of the lines could impair the ability of firefighters to respond because, ground based fire response would have to maintain a greater distance from the lines and if firefighting aircraft collided with the lines the occupants could sustain electrical shock. (Id. ¶¶ 14, 15.)

The Court agrees with Plaintiffs that, if a large wildfire occurred, it could cause irreparable injury to Plaintiffs for which there would be no adequate remedy at law.

---

[3] Plaintiffs also argue that the energized lines and rotating wind turbines will kill thousands of birds. However, Plaintiffs fail to offer any evidence to the effect that (1) energized lines will cause avian fatality or (2) avian fatality stemming from rotating turbines will actually impact Plaintiffs. Furthermore, after careful consideration of the issue, the MMENR concluded that the Wind Farm would not impact avian species at the population level or on a regional scale. (Barajas Decl. ¶ 22.)

However, Plaintiffs have not submitted any evidence suggesting how likely it is that continued operation during the remand period may spark a wildfire. The FEIS concluded that the chances of such a fire are "rare", meaning unlikely. AR 12799–800. Furthermore, the project has been in operation for more than two years. Plaintiff does not allege the Project has sparked a single fire during this timeframe, and Defendant has produced evidence suggesting it has not. (See Barajas Decl. ¶ 30.)

Though the chances of continued operation during the remand period sparking a fire appear low, there is no question that the issuance of an injunction would negatively impact ESJ and the public interest. As to ESJ, an injunction would eliminate a substantial revenue stream. The Wind Farm alone is an investment worth over $300 million. (Barajas Decl. ¶ 6.) In 2016, the Wind Farm generated $44 million in revenue from transmitting energy into the U.S. power grid. (Id. ¶ 36.) Enjoining operation would kill this revenue stream. (Id.) Further, the current configuration of the Wind Farm is such that it can only transmit energy to the U.S. (Id. ¶ 34.) Though ESJ could reconfigure the Wind Farm for export to the Mexican power grid, it is not feasible that ESJ could complete such a reconfiguration before expiration of the remand period. (Id.) In other words, ESJ would be unable to mitigate the financial damage an injunction would cause.

However, the most compelling argument against granting injunctive relief stems from public interest considerations. That the generation of clean, renewable energy is of substantial importance to the public interest is beyond dispute. The Wind Farm produces a considerable amount of clean, renewable energy. It carries a generating capacity of 155 megawatts, enough to power approximately 65,000 average households. (Bararjas Decl. ¶ 6.) Thus, enjoining Project operation would significantly decrease the local supply of clean, renewable energy, which would likely have the effect of increasing reliance on more environmentally harmful energy production technology. (Padilla Decl. [Doc. 120-3] ¶ 13.) Injunctive relief could also negatively impact local power grid reliability if other generation sources went offline for any reason and the Wind Farm was legally

9

unavailable as a reserve source of energy production. (Id. ¶¶ 1–12.)

Continued operation is also in the public interest from a financial economic standpoint. Project revenues are taxed by the Government of Mexico. Thus, if revenues cease, the Mexican treasury receives less money. Furthermore, the land upon which the Wind Farm stands is owned by a Mexican agricultural collective community called Ejido Jacume. (Barajas Decl. ¶ 5.) Under the contract they executed with ESJ, Ejido Jacume receives a fixed percentage of Project revenues in consideration for the lease of their land. (Id. ¶ 35.) In 2016, ESJ paid Ejido Jacume an average of $148,000 a month on the lease. (Id.) These lease payments from ESJ appear to be a very significant revenue stream to this population. Only about 5% of the Ejido Jacume population have a high school degree; 71% are of low enough means to qualify for Mexico's version of Medicaid; and over half make less than $128 a month in wages. (Id. ¶ 35.) Because Plaintiffs' requested injunctive relief would completely dry up this revenue stream, it would cause significant harm to Ejido Jacume.

Enjoining operation would also hurt the local Mexican economy by eliminating paying jobs. The Ninth Circuit has held that elimination of paying jobs favors a denial of injunctive relief under NEPA. *Toxics*, 688 F.3d at 994. Here, ESJ has submitted evidence that ceased operation would likely eliminate more than thirty jobs in Mexico and result in the termination of contracts worth about $600,000 annually. (Barajas Decl. ¶ 39.)

The public interest therefore clearly seems to favor denying injunctive relief. However, Plaintiffs correctly argue that NEPA is aimed at fostering informed and meaningful consideration of the environmental consequences of federal actions before such actions occur. Plaintiffs further argue that if this Court does not issue an injunction, federal agencies will have inadequate incentive to comply with NEPA.

The Court disagrees. Remand to DOE for further review and preparation of a supplemental environmental impact statement addressing the deficiencies noted in this Court's previous orders will encourage compliance with NEPA. So too does the fact that

NEPA plaintiffs, such as Plaintiffs here, are entitled under the Federal Rules of Civil Procedure to file a motion for preliminary injunctive relief. Moving for such relief before construction moots complaints about environmental harms strengthens a NEPA plaintiff's position under both the vacatur test and the injunctive relief test. This is because, before construction begins, the disruptive consequences of a vacatur tend to be less severe and the remediable harms to the plaintiffs' interests that injunctive relief can address tend to be greater. Furthermore, this generalized argument, if granted, would seem to require a court to issue an injunction anytime an agency violates NEPA, regardless of how minor the harm to plaintiff or how significant the harm to a defendant and the public interest. Such a holding would seem in conflict with Ninth Circuit law establishing that not all NEPA violations require setting the agency action aside. *Toxics,* 688 F.3d at 992.

Given the foregoing, the Court finds injunctive relief unwarranted on these facts. The certain and significant harms that injunctive relief would cause to the supply of clean energy, ESJ, the Ejido Jacume, Mexican tax revenue, and paying jobs outweigh Plaintiffs' concerns that continued operation could possibly spark a big wildfire that could harm them. Accordingly, the Court **DENIES** Plaintiffs' request for an injunction prohibiting continued operation.

### B. Further Expansion

Plaintiffs also seek an injunction prohibiting further expansion of the Wind Farm. Plaintiffs' argument for this relief consists only of citation to portions of the administrative record. AR 12472, 12473, 12482–83, 12515, 12555–56, 12560, 12607–08. The Court has reviewed all portions of the Administrative Record to which Plaintiffs cite. From the record, it appears that the proposed expansion would involve increasing power generation from 155 megawatts to up to 1,250 megawatts. AR 12482. This expansion is not a planned certainty. It is simply a future option considered in the FEIS. (Id.) If the expansion happens, the new wind turbines would likely be located a number

11

3:12-cv-03062-L-JLB

of miles south of the existing Wind Farm. (Id.) It appears highly unlikely that the new turbines would even be viewable from the United States. (AR 12483) ("Subsequent expansion of the [Wind Farm] would be located south of the town of La Rumorosa . . . , sufficiently distant from the U.S. viewing points such that visual impacts are not expected."); (AR 12472) (map showing location of future phase wind turbines.)

As noted above, the only environmental harms relevant to the injunctive relief analysis are those that accrue to Plaintiffs. *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1025–26 (E.D. Cal. 2013) (*citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190–81 (2000). Plaintiffs do not submit any evidence explaining how the construction of turbines approximately twenty miles south of the border will cause harm *to them*. Indeed, Plaintiffs do not even provide an explanation of such alleged harms. A failure to submit evidence demonstrating an irreparable injury for which there is no adequate remedy at law is fatal to a request for permanent injunctive relief. *Monsanto,* 561 U.S. at 156–5y. The Court therefore **DENIES** Plaintiffs' request for a permanent injunction prohibiting further expansion of the Wind Farm during the remand period.

//
//
//
//
//
//
//
//
//
//
//

## IV. CONCLUSION & ORDER

For the foregoing reasons, the Court orders as follows:

- Plaintiffs' request for vacatur is **DENIED**.
- Plaintiffs' request for a permanent injunction is **DENIED**.
- This case is remanded to DOE for preparation of a supplemental environmental impact statement that addresses the deficiencies identified in this Court's previous orders [Docs 87, 113]. The Clerk of Court shall enter judgment for Plaintiffs.
- Plaintiffs' request for retained jurisdiction is **DENIED.**
- Defendants' ex parte motion [Doc. 126] for oral argument is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

Dated: August 29, 2017

_____
Hon. M. James Lorenz
United States District Judge